## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

LESTER JOSE GONZALEZ,

      Petitioner,

v.                                                    Case No. 2:26-cv-02017-MSN-atc

SCOTT LADWIG, *Acting Field Office*
*Director of Immigration and Customs*
*Enforcement, New Orleans Field Office*,

      Respondent.

## ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241 AND DENYING EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

In the past several months, there has been a dramatic increase of habeas filings both in the Western District of Tennessee and in district courts across the country. These petitions challenge a change in policy and statutory interpretation at the Department of Homeland Security ("DHS") regarding Immigration and Customs Enforcement's ("ICE") authority to detain aliens present in—but not lawfully admitted to—the United States. On July 8, 2025, ICE issued a policy memo explaining that noncitizens who have resided in the interior of the United States are subject to mandatory detention under 8 U.S.C. § 1225.[1] Prior to that memo, it was longstanding practice to provide aliens apprehended in the interior with bond hearings under 8 U.S.C. § 1226. On September 5, 2025, the Board of Immigration Appeals ("BIA") issued a precedential decision

---

[1] American Immigration Lawyers Association, *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, AILA (July 8, 2025), https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission (last visited Feb. 13, 2026), *archived at* https://perma.cc/VG23-GDJ2.

upholding DHS's interpretive shift, binding immigration judges nationwide to deny bond hearings that had been previously available. *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 228 (BIA 2025) ("Immigration Judges . . . have no authority to redetermine the custody conditions of an alien who crossed the border unlawfully without inspection, even if that alien has avoided apprehension for more than 2 years.")  Petitioner here, with many others across the country, challenges that interpretation and his detention during pending removal proceedings.

DHS's policy shift and the BIA's ratification of it are, without a doubt, difficult changes for Petitioner and the multitude of other similarly situated individuals nationwide.  The Court is sensitive to the impact this has on them, their families, and the ties that many of them have developed in this country.  But courts are not policymakers, nor are they empowered to unilaterally change the plain text of a statute to avoid an outcome the law demands.  Whatever this Court's feelings may be, Petitioner's right to enter and reside in "the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 216 (1953).

## BACKGROUND

On January 8, 2026, Petitioner Lester Jose Gonzalez filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241.  (ECF No. 1, "Petition.")  On the same day, Petitioner also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction.  (ECF No. 2, "Emergency Motion.")  This Court then issued an Order directing the Government's response and setting a hearing on the request for a temporary restraining order.  (ECF No. 11.)  The Government filed its Response on January 14, 2026 (ECF No. 18), and Petitioner filed his Reply on January 15, 2026 (ECF No. 19).  On January 22, 2026, the Court held a hearing and took the matter under advisement.  (ECF No. 21.)

2

The Petition is short on factual material, but the Emergency Motion provides more clarity. Petitioner is a native and citizen of Nicaragua and not a United States citizen. (ECF No. 2-1 at PageID 21.) He unlawfully entered the United States on December 22, 2021, at Eagle Pass, Texas, and was arrested by United States Border Patrol on the same day. (*Id.* at PageID 22.) On December 24, 2021, a Notice to Appear was issued, charging Petitioner with being an "alien present in the United States who has not been admitted or paroled." (*Id.* at PageID 31.) He was then released on his own recognizance "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act ["INA"]." (*Id.* at PageID 29.) Petitioner was arrested again while at the Nashville Immigration and Customs Enforcement ("ICE") Office on October 30, 2025.[2] (*Id.* at PageID 22, 33.) He is now detained at the West Tennessee Detention Facility in Mason, Tennessee. (*Id.* at PageID 33.) At some point during his detention, Petitioner "requested a custody redetermination pursuant to 8 C.F.R. § 1236," which was denied by an Immigration Judge on December 17, 2025. (*Id.* at PageID 36.) Petitioner is currently classified as an alien within the meaning of 8 U.S.C. § 1225(b)(2)(A), mandating detention. (ECF No. 1 at PageID 2.) He comes before this Court seeking immediate release. (*Id.* at PageID 8.) He asserts that he is entitled to relief for a variety of reasons, including that the Government has incorrectly interpreted and applied the relevant statutory framework and that his continued detention violates due process. (*See generally id.*)

---

[2] Though not material, there is a discrepancy in the record regarding Petitioner's arrest. The Government's Response indicates that he was taken into custody on October 20, 2025, and that he was at the Nashville ICE Office to fulfill *his* reporting requirements. (ECF No. 18 at PageID 180.) Petitioner's counsel represented at the January 22 hearing, however, that Petitioner was actually dropping his wife off to comply with *her* reporting requirements.

## JURISDICTION

This Court is authorized to issue a writ of habeas corpus under 28 U.S.C § 2241 when an individual "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). And in certain circumstances, habeas corpus proceedings under § 2241 are available to aliens who want to challenge their detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001); *Rasul v. Bush*, 542 U.S. 466, 473–84 (2004); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 118 (2020) (noting that "the historic role of habeas is to secure release from custody"); *Munaf v. Green*, 553 U.S. 674, 693 (2008) ("Habeas is at its core a remedy for unlawful executive detention."). Because Petitioner alleges that he is being held in violation of the statutory provisions of the INA, i.e., laws of the United States, his claims are properly brought pursuant to § 2241.

However, § 1252(b)(9) provides that:

> [j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9).

As the Supreme Court recognized, it could be argued that Petitioner's detention in this matter "aris[es] from" an "action taken . . . to remove" him from the United States because "if those actions had never been taken," Petitioner "would not be in custody at all." *Jennings v. Rodriguez*, 583 U.S. 281, 292–93 (2018). But the Supreme Court expressly rejected "interpreting 'arising from' in this extreme way," noting that doing so would "make claims of prolonged detention effectively unreviewable." *Id.* at 293. Applying the reasoning in *Jennings*, Petitioner's challenge here does not "arise from" an action taken to remove him, so § 1252(b)(9) does not deprive the Court of jurisdiction.

4

Another "potential hurdle" to the Court's jurisdiction is § 1226(e), which bars review of "the Secretary's discretionary judgment regarding the application of § 1226." *Nielsen v. Preap*, 586 U.S. 392, 401 (2019) (citation modified). But, again, the Supreme Court has found that § 1226(e) "applies only to discretionary decisions about the application of § 1226 to particular cases. It does not block lawsuits over the extent of the Government's detention authority under the statutory framework as a whole." *Nielsen*, 586 U.S. at 401 (citing *Jennings*, 583 U.S. at 295–96) (citation modified). Like the aliens in *Nielsen*, Petitioner's claim does not challenge "discretionary application" of § 1226, so his claim is not barred by § 1226(e). *Id.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Before seeking judicial review of adverse administrative determinations, parties may first be required to exhaust their administrative remedies, i.e., pursue "all possible relief within the agency itself." *Howell v. I.N.S.*, 72 F.3d 288, 291 (2d Cir. 1995). Sometimes Congress mandates administrative exhaustion by including it in a statute governing judicial review. *Perkovic v. I.N.S.*, 33 F.3d 615, 619 (6th Cir. 1994). But "in most contexts, exhaustion of administrative remedies is a prudential, court-created doctrine." *Id.* (citation modified). The parties agree that exhaustion of administrative remedies is not statutorily required here; instead, requiring administrative exhaustion here is a prudential matter.

As a prudential matter, the Court agrees with the reasoning of other district courts in the Sixth Circuit that requiring Petitioner to exhaust his administrative remedies would be futile given the BIA's decision in *Matter of Yajure Hurtado*. *See, e.g.*, *Pizarro Reyes v. Raycraft*, No. 25-CV-12546, 2025 WL 2609425, at *3–4 (E.D. Mich. Sept. 9, 2025); *Cordova v. Ladwig*, No. 1:25-CV-03037-TLP-JAY, 2025 WL 3679764, at *4–5 (W.D. Tenn. Dec. 18, 2025). Nothing in the record or caselaw suggests that the BIA would depart from its reasoning in *Hurtado* if Petitioner here was

to appeal. So the Court will not require Petitioner to exhaust his administrative remedies before addressing the merits of his Petition.

## ANALYSIS

Petitioner asks the Court to grant his immediate release from ICE custody and provides four grounds purportedly justifying that relief. [3] First, he asserts that his detention is governed by § 1226, which permits the release of ICE detainees after a bond hearing, rather than § 1225, under which detention is mandatory. (ECF No. 2 at PageID 14.) Second, Petitioner argues that continued detention violates his rights under the Fifth Amendment's Due Process Clause. (ECF No. 1 at PageID 7.) Third, he asserts that, regardless of this Court's independent interpretation of the INA, the Court is bound by a declaratory judgment adopting his interpretation in *Maldonado Bautista v. Santacruz*, 2025 WL 3288403 (C.D. Cal. Nov. 25, 2025). (ECF No. 2 at PageID 14–15.) Fourth and finally, Petitioner claims entitlement to relief under the Administrative Procedure Act ("APA"). (ECF No. 1 at PageID 7.)

There are four main questions, then. The first is one of statutory interpretation: Is Petitioner's detention governed by § 1225, which mandates detention, or is it governed by § 1226, which allows a bond hearing? The second is a constitutional one: Does continued detention of Petitioner without a bond hearing violate the Fifth Amendment's Due Process Clause? The third is one of intra-judicial preclusion: Is this Court bound by the decision of another judge in the Central District of California? The fourth and final question concerns judicial review of agency action: Has Petitioner stated a claim for relief under the APA? The Court will address each of the

---

[3] The Parties agree that both the Petition and the Emergency Motion present the same, purely legal issues. (ECF No. 18 at PageID 180, nn.2–3; ECF No. 19 at PageID 213.) Accordingly, the January 22 hearing consolidated both consideration of the Emergency Motion and the merits of the Petition.

questions in turn, ultimately concluding, for the reasons given below, that Petitioner is not entitled to relief.

## A.    First Question: Does § 1225 or § 1226 apply to Petitioner?

### 1.    The Proper Construction of §§ 1225 & 1226

The analysis begins with familiar rules of statutory interpretation.  "[T]he plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover."  *Lynch v. Alworth-Stephens Co*, 267 U.S. 364, 370 (1925).  Step one, therefore, "is to examine the plain meaning of the statute's text."  *Perez v. Bondi*, 160 F.4th 710, 714 (6th Cir. 2025).  But courts do not examine "the language of a statute in a vacuum"; instead, they do so while "look[ing] to the structure, history, and purpose of the statutory scheme."  *Ebu v. U.S. Citizenship & Immigr. Servs.*, 134 F.4th 895, 898 (6th Cir. 2025) (citation omitted); *Keen v. Helson*, 930 F.3d 799, 803 (6th Cir. 2019) ("Statutory interpretation is a 'holistic endeavor'—the structure and wording of other parts of a statute can help clarify the meaning of an isolated term." (citation omitted)).  So different sections of the INA must be interpreted "as a harmonious whole," taking care "not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."  *Ebu*, 134 F.4th at 898–99 (citation omitted).  If the language is unclear, then step two is to "examine the relevant legislative history."  *Perez*, 160 F.4th at 715.

To start, who is an "applicant for admission"?  That term is defined in § 1225(a)(1), which provides as follows:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in

international or United States waters) shall be deemed for purposes of this chapter
an applicant for admission.

8 U.S.C. § 1225(a)(1).

So, § 1225(a)(1) deems two groups of aliens to be "applicants for admission": (1) those
"present in the United States" who have "not been admitted," and (2) those "arriving" in the United
States, whether or not at a designated port of arrival. *See* 8 U.S.C. § 1225(a). And "[a]ll aliens
(including crewmen) who are applicants for admission or otherwise seeking admission or
readmission to or through the United States must be inspected by immigration officers," 8 U.S.C.
§ 1225(a)(3), "to ensure that they may be admitted into the country consistent with U.S.
immigration law." *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(a)(3)).

Next, § 1225(b) "divides these applicants into two categories." *Jennings*, 583 U.S. at 297.
The first consists of "aliens initially determined to be inadmissible due to fraud, misrepresentation,
or lack of valid documentation," along with "certain other aliens designated by the Attorney
General in his discretion." *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(b)(1)(A)(i) & (iii)).
The "certain other aliens" included in this first category are those who have "not been admitted or
paroled into the United States," and have "not affirmatively shown" that they have "been
physically present in the United States continuously for the 2-year period immediately prior to the
date of the determination of inadmissibility" (subject to a specific exception not relevant here).[4] 8
U.S.C. § 1225(b)(1)(A)(iii)(II). An alien in this first category is "normally ordered removed
'without further hearing or review' pursuant to an expedited removal process," unless the "alien
'indicates either an intention to apply for asylum . . . or a fear of persecution,'" at which point "that

---

[4] "Certain other aliens" does not include those aliens described in 8 U.S.C. §
1225(b)(1)(F)—natives or citizens of countries in the Western Hemisphere with whose
government the United States does not have full diplomatic relations and who arrive by aircraft at
a port of entry.

8

alien is referred for an asylum interview." *Jennings*, 583 U.S. at 287 (citing 8 U.S.C. § 1225(b)(1)(A)(i)–(iii)).

The second category is a "catchall," consisting of all other applicants for admission who are not covered by the first category. *Jennings*, 583 U.S. at 287. Aliens in this second category are subject to removal pursuant to the process in § 1229a. *Jennings*, 583 U.S. at 287–88 (citing 8 U.S.C. § 1225(b)(2)(A)). Specifically, the relevant statutory language says that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). Aliens in both categories are subject to "mandatory detention until the conclusion of the inspection process—whether it is through expedited removal or the conclusion of § 1229a removal proceedings." *Oliveira v. Patterson*, No. 6:25-CV-01463, 2025 WL 3095972, at *4 (W.D. La. Nov. 4, 2025).

Now, compare the language and structure of § 1225 with § 1226(a), which provides in relevant part as follows:

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on--
>
>> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
>>
>> (B) conditional parole; but
>
> (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise

would (without regard to removal proceedings) be provided such authorization.

8 U.S.C. § 1226(a).

The most obvious difference between the two sections is their scope. The language of § 1226 speaks broadly about "an alien," without qualification. But § 1225 is narrower. Its provisions refer to only a specific subset of aliens—applicants for admission.

In this case, Petitioner insists he is not subject to § 1225(b)(2)(A) because he is not an "applicant for admission" who is "seeking admission." This Court respectfully disagrees.

Under the plain language of the statute, Petitioner is an "applicant for admission" as defined in § 1225(a)(1). He is "an alien" and is "present in the United States." And, he "has not been admitted" because he did not lawfully enter the United States "after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.").

As an "applicant for admission," Petitioner is also "seeking admission."[5] In the context of § 1225(b)(2)(A), "seeking admission" does not modify or limit the class of "applicants for

---

[5] Other courts, however, have found to the contrary, reasoning that "seeking admission" in § 1225(b)(2)(A), "implies some sort of present-tense action." *Cobix v. Raycraft*, No. 1:25-CV-1669, 2025 WL 3562651, at *5–6 (W.D. Mich. Dec. 12, 2025) (citation omitted). Those courts concluded that aliens already present in the United States were not "seeking admission," and thus construing § 1225(b)(2)(A) as applying to those aliens failed to give effect to all words in the statute. *See, e.g., Martinez v. Hyde*, 792 F. Supp. 3d 211, 218 (D. Mass. 2025); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 487 (S.D.N.Y. 2025); *Garcia v. Noem*, No. 2:25-CV-00879-SPC-NPM, 2025 WL 3041895, at *3 (M.D. Fla. Oct. 31, 2025); *Ochoa Ochoa v. Noem*, No. 25 CV 10865, 2025 WL 2938779, at *6 (N.D. Ill. Oct. 16, 2025) (concluding "those who have been present in the country for years are not actively 'seeking admission'"); *see also Francisco T. v. Bondi*, No. 25-CV-3219 (JMB/DTS), 2025 WL 3490809, at *8 (D. Minn. Sept. 5, 2025), *report and recommendation adopted*, No. 25-CV-03219 (JMB/DTS), 2025 WL 3236513 (D. Minn. Nov. 19, 2025) (reaching the same conclusion but recognizing that § 1225(a)(3) "can be read to suggest

admission" to whom the section applies.[6]    Instead, the structure of § 1225(b)(2)(A) indicates

"equivalent usage" of the two terms.  As Judge Dishman explained,

> [t]he prefatory language, "in the case of an alien who is an applicant for admission,"
> sets the scope of what follows. 8 U.S.C. § 1225(b)(2)(A). Had Congress meant to
> imply a category of applicants for admission who might not be seeking admission,
> the natural manner of doing so would read "in the case of an alien who is both an
> applicant for admission and seeking admission." Instead, the phrase "alien seeking
> admission" comes after the operative language, "if the examining immigration
> officer determines." *Id.* This structure indicates that "alien seeking admission"
> refers to the prior subject—it does not imply modification of the prior subject.

*Montoya v. Holt*, No. CIV-25-01231-JD, 2025 WL 3733302, at *10 (W.D. Okla. Dec. 26, 2025).

And reading the language in the context of the entire section confirms this understanding.

First, § 1225(a)(3) requires inspection of "[a]ll aliens (including alien crewmen) who are

applicants for admission or otherwise seeking admission . . ." 8 U.S.C. § 1225(a)(3).  As other

courts have explained, § 1225(a)(3) indicates a logical relationship between the phrases, so that all

aliens who are deemed "applicants for admission" in § 1225(a)(1) are also "seeking admission."

*See, e.g.*, *Mejia Olalde v. Noem*, No. 1:25-CV-00168-JMD, 2025 WL 3131942, at *3 (E.D. Mo.

Nov. 10, 2025); *Shi v. Lyons*, No. 1:25-CV-274, 2025 WL 3637288, at *5 (S.D. Tex. Dec. 12,

---

all applicants for admission are constructively treated as seeking admission," and noting other
issues that make interpreting INA difficult).

On the other hand, in the context of inadmissibility waivers, the Fourth Circuit noted that,
although such waivers are limited "to those 'seeking admission,'" that limitation did not
automatically preclude a waiver for Mr. Jimenez-Rodriguez, an alien who had been present in the
United States for almost 20 years. *Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 194 n.2 (4th Cir.
2021) (citations omitted).  The Fourth Circuit reasoned that "[b]ecause Jimenez-Rodriguez was
never lawfully admitted, he qualifies as someone 'seeking admission[.]'" *Id.*

[6] Admittedly, construing the statute in this manner renders "seeking admission" in §
1225(b)(2)(A) unnecessary.  But this construction is still the best overall reading of the statute.
Nor is the superfluity surprising, and there is at least one other substantive redundancy in § 1225:
Both (a)(2) and (b)(2)(B)(iii) bar stowaways from being "applicants for admission" or receiving
hearings under § 1229a.

2025); *Garibay-Robledo v. Noem*, No. 1:25-CV-177-H, 2026 WL 81679, at *5 (N.D. Tex. Jan. 9,

2026); *Montoya*, 2025 WL 3733302, at *7; *Altamirano Ramos v. Lyons*, No. 2:25-CV-09785-SVW-

AJR, 2025 WL 3199872, at *5 (C.D. Cal. Nov. 12, 2025).   Judge Dishman again provides a

particularly cogent explanation:

> The better reading starts with the period-correct definitions of "otherwise," which
> are "[i]n a different manner; in another way, or in other ways." Otherwise, Black's
> Law Dictionary (6th ed. 1990). Those definitions imply that the condition preceding
> "otherwise" shares a category with the condition following it.
>
> Two examples show the impact of the word "otherwise" in "applicants for
> admission or otherwise seeking admission." 8 U.S.C. § 1225(a)(3). Consider an
> inventory list that includes the following two entries:
>
> > (1) "Animals that are housecats or otherwise canine."
> >
> > (2) "Animals that are housecats or otherwise feline."
>
> The first entry is absurd—no canines are housecats, or vice versa. But the second
> entry makes sense because the word "otherwise" creates a formal logical syllogism,
> and that syllogism is valid. Not all felines are housecats, but all housecats are feline.
> And critically, housecats are housecats in the first instance, involuntarily. Using the
> plain language definition of "otherwise" in the context of an involuntary legal
> status, the preceding noun must share the condition that follows.
>
> Now apply this logic from the start: Section 1225(a)(1) "deem[s]" "an alien present
> in the United States who has not been admitted ... an applicant for admission." The
> statute doesn't describe what the alien is doing. It imposes a status by operation of
> law. Section 1225(a)(3) then says "[a]ll aliens ... who are applicants for admission
> or otherwise seeking admission" shall be inspected. The word "otherwise"
> establishes that "aliens ... seeking admission" is the category to which "applicants
> for admission" belong. If "applicants for admission" are subject to inspection
> because they fall within the broader class of those "seeking admission," then the
> statute necessarily treats "seeking admission" as a condition that attaches to anyone
> deemed an "applicant for admission."
>
> . . .
>
> So, all "applicants for admission" are "seeking admission." The former is sufficient
> (but not necessary) for the latter, and the latter is necessary (but not sufficient) for
> the former. Congress used a straightforward logical syllogism. Stated another way,
> § 1225(a)(3) leaves open the possibility that some aliens who are not applicants for
> admission may nonetheless be "seeking admission." But it does not leave open the
> possibility that some "applicants for admission" are not "seeking admission."

*Montoya*, 2025 WL 3733302, at \*8–9.

Second, § 1225(a)(5) provides that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in *seeking admission* to the United States." 8 U.S.C § 1225(a)(5) (emphasis added). "The logical import of this phrasing is that an 'applicant for admission' is also 'seeking admission' under the statute." *Garibay-Robledo*, 2026 WL 81679, at \*5; *see also Singh v. Noem*, No. 2:25-CV-00157-SCM, 2026 WL 74558, at \*4 (E.D. Ky. Jan. 9, 2026) ("[I]t makes no sense to think of an 'applicant for admission' as anything other than a person who is 'seeking admission.' What else would an applicant for admission be doing if not seeking admission?").

Third, other subsections in § 1225 specifically say, "arriving alien," or "an alien . . . who is arriving." *See, e.g.,* 8 U.S.C. § 1225(a)(2) ("arriving alien who is a stowaway is not eligible to apply for admission or to be admitted"); *id.* § 1225(d)(2) (addressing "authority to order detention and delivery of arriving aliens" coming to the United States via vessel or aircraft); *id.* § 1225(c)(1) ("If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible . . ."); *id.* § 1225(b)(1)(a)(i) ("if an immigration officer determines that an alien . . . who is arriving in the United States . . . ."); *id.* § 1225(b)(1)(a)(ii) (same). The absence of similar language in § 1225(b)(2)(A) indicates Congress did not intend for it to apply only to arriving aliens. *See, e.g. Garibay-Robledo,* 2026 WL 81679, at \*5; *Mejia Olalde*, 2025 WL 3131942, at \*4.

Finally, construing § 1225(b)(2)(A) as inapplicable to unadmitted aliens who have been present in the United States for several years by reasoning that those individuals are not "seeking admission" creates an implied third category of aliens, who are not explicitly addressed anywhere in the statutory scheme: unadmitted aliens present in the United States who are not seeking

admission.[7]  Or, to put it in more absurd terms: applicants for admission who are not seeking admission.[8]  *See Garibay-Robledo*, 2026 WL 81679, at *5; *Montoya*, 2025 WL 3733302, at *2, *11 & n. 9; *Mejia Olalde*, 2025 WL 3131942, at *3.

Because the language of the statute is clear, there is no need to examine relevant legislative history.  *See Perez*, 160 F.4th at 715.  After all, "the objective indication of the words, rather than the intent of the legislature, is what constitutes the law."  Antonin Scalia, A Matter of Interpretation 29–30 (1997).  Nevertheless, the relevant legislative history also supports that aliens, like Petitioner, remain "applicants for admission," even when present in the United States for long periods of time:

> In 1996, Congress added the broad definition of "applicant for admission" to the INA in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Pub. L. No. 104-208, 110 Stat. 3009. "Prior to the [IIRIRA], the INA assessed status on the basis of 'entry' as opposed to 'admission.'" *Martinez v. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012) (quoting 8 U.S.C. § 1101(a)(13) (1994)). Under this so-called entry doctrine, aliens who snuck into the United States without inspection were entitled to the procedural and substantive protections afforded in deportation proceedings. *Id.* Yet aliens who presented themselves to immigration officials for inspection—say, at a port of entry—were subject to "more summary exclusion proceedings." *Id.* (quotation omitted). This distinction—where aliens who followed the rules and presented for inspection were worse off than those who broke the law—created "a perverse incentive to enter at an unlawful rather than a

---

[7] And ironically, Petitioner's interpretation treats this group *more favorably*.  By "refus[ing] to do anything that would constitute 'seeking admission,'" these aliens "would not be subject to mandatory detention, while those who do seek permission to stay in the United States would be subject to mandatory detention.  That makes no sense."  *Singh*, 2026 WL 74558, at *5; *Chen v. Almodovar*, No. 1:25-CV-8350-MKV, 2025 WL 3484855, at *5 (S.D.N.Y. Dec. 4, 2025) (Courts "ruling that 'seeking admission' is an additional requirement for mandatory detention . . . establish a perverse system in which an alien becomes subject to harsher treatment only upon actively seeking 'lawful' status.").

[8] The absurdity of this is highlighted even more when framed in the context of § 1225(a)(4).  This third category would be "applicants for admission" who are "applying" for admission "yet not necessarily 'seeking' admission.  But this simply cannot be.  What individual is 'applying' for a given legal status without 'seeking' such a status?"  *Montoya*, 2025 WL 3733302, at *10.

lawful location." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140, 140 S.Ct. 1959, 207 L.Ed.2d 427 (2020).

> IIRIRA did away with this anomaly. Congress replaced the entry doctrine with a criterion based on admission, which it defined as "*lawful* entry . . . after inspection and authorization." 8 U.S.C. § 1101(a)(13)(A) (emphasis added). Congress also added Section 1225(a)(1)—the definition of "applicant for admission"—and mandated detention for all such applicants while their removal proceedings play out. *See* 8 U.S.C. § 1225(b)(2)(A). By defining "applicant for admission" to include all aliens who have not been admitted, Congress thus eliminated the previous incentives to enter the country illegally.

*Garibay-Robledo*, 2026 WL 81679, at *6; *see also Chen*, 2025 WL 3484855, at *3, *5; *Altamirano Ramos*, 2025 WL 3199872, at *5.

In sum, under the plain language of the statute, Petitioner is an "applicant for admission." He is not covered by first category of aliens described in § 1225(b)(1); instead, he falls into the second "catchall" category described in § 1225(b)(2)(A). As a result, he is subject to mandatory detention pending the completion of removal proceedings under § 1229a.

### 2.   Other Courts' Contrary Constructions

At first blush, it appears that a majority of the courts addressing this issue have interpreted §§ 1225 and 1226 differently from this Court, and they have generally granted bond hearings to the alien petitioners.[9] *See, e.g.*, *Cordova*, 2025 WL 3679764, at *8; *Godinez-Lopez v. Ladwig*, No. 2:25-CV-02962-SHL-ATC, 2025 WL 3047889, at *2 (W.D. Tenn. Oct. 31, 2025); *Lopez Benitez*, 795 F. Supp. 3d at 491; *Hasan v. Crawford*, 800 F. Supp. 3d 641, 657 (E.D. Va. 2025); *Chogllo Chafla v. Scott*, 804 F. Supp. 3d 247, 257 (D. Me. 2025) (collecting cases); *Francisco T.*, 2025 WL 3490809, at *11; *Maldonado Vazquez v. Feeley*, No. 2:25-CV-01542-RFB-EJY, 2025 WL 2676082, at *13–14 (D. Nev. Sept. 17, 2025); *Garcia*, 2025 WL 3041895, at *3; *Maldonado v.*

---

[9] This tide, however, may yet begin to turn. *See Buenrostro-Mendez v. Bondi*, No. 25-20496, --- F.4th ---, 2026 WL 323330 (5th Cir. Feb. 6, 2026) (confirming the Government's interpretation of § 1225 and reversing the lower court's order to provide bond hearings).

*Baker*, No. CV 25-3084-TDC, 2025 WL 2968042, at \*7 (D. Md. Oct. 21, 2025).[10]  The thoughtful analyses of these other courts was valuable to the Court in refining its understanding of the statutory scheme but, ultimately, the Court is unpersuaded by their reasoning.

For example, some courts ruling for the petitioners have found the titles of §§ 1225 and 1226 to be persuasive.  *See, e.g.*, *Cobix*, 2025 WL 3562651, at \*5–6; *Maldonado Vazquez*, 2025 WL 2676082, at \*13–14; *Mendoza Gutierrez v. Baltasar*, No. 25-CV-2720-RMR, 2025 WL 2962908, at \*6 (D. Colo. Oct. 17, 2025); *Maldonado*, 2025 WL 2968042, at \*7.  But even though "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute," they cannot "override the plain words of a statute."  *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (citation modified).  The plain words of § 1225(a) define "applicant for admission" to include aliens present in the United States who have not been admitted—full stop.  The definition is broad; there is no geographic or temporal limitation.  Also, courts persuaded by the title of § 1225 have generally focused only on the second clause, "expedited removal of inadmissible arriving aliens," reasoning that the alien petitioner was not an "arriving alien" who was subject to "expedited removal."  *See, e.g.*, *Cobix*, 2025 WL 3562651, at \*5–6.  But that reasoning "fails to appreciate the remainder of the title.  The latter portion of the

---

[10] Other judges in this District have granted bond hearings under a different reading of the statutory provisions at issue.  But "[d]ecisions made by district courts within the same district are not binding on one another."  *Raymond James & Assocs., Inc. v. 50 N. Front St. TN, LLC*, No. 2:18-CV-02104-JTF-TMP, 2020 WL 6694299, at \*3 (W.D. Tenn. Nov. 13, 2020) (citing *Chinn v. Jenkins*, No. 3:02-CV-512, 2018 WL 488159, at \*2 (S.D. Ohio Jan. 19, 2018)).  *See also Robertson v. Univ. of Memphis*, No. 2:24-CV-02429-TLP-cgc, 2025 WL 929220, at \*8 (W.D. Tenn. Mar. 27, 2025) (acknowledging that "district courts' decisions are not binding on this Court"); *Nationwide Mut. Fire Ins. Co. v. Hatton*, 357 F. Supp. 3d 598, 605 (E.D. Ky. 2019) ("The opinions of other federal district courts, while persuasive, are not binding authority that this Court must follow."); *Chen*, 2025 WL 3484855, at \*4 (acknowledging "that a number of judges in [the same] District ruled differently).

title reads 'referral for hearing,' which relates to aliens subject to 'full removal proceedings,' like Petitioner." *Montoya*, 2025 WL 3733302, at *6; *see also Mejia Olalde*, 2025 WL 3131942, at *3.[11]

Court have also reasoned that applying § 1225(b)(2)(A) to aliens who have been present in the United States for years, like Petitioner, would make all or part of § 1226 superfluous. *See, e.g.*, *Lopez Benitez*, 795 F. Supp. 3d at 490–91; *Maldonado Vazquez*, 2025 WL 2676082, at *14; *Chogllo Chafla*, 804 F. Supp. 3d at 259 (reasoning that if § 1225(b)(2) applies to aliens already present in the country, "it would preclude the need for § 1226(a) to exist at all"); *Patel v. Crowley*, No. 25 C 11180, 2025 WL 2996787, at *8 (N.D. Ill. Oct. 24, 2025) ("Respondent's interpretation of Section 1225(b)(2)(A) would largely nullify Section 1226(a) because it is not clear under what circumstances § 1226(a)'s authorization of detention on a discretionary basis would ever apply." (citation omitted)); *Villa v. Normand*, No. 5:25-CV-89, 2025 WL 3095969, at *9 (S.D. Ga. Nov. 4, 2025), *report and recommendation adopted*, No. 5:25-CV-100, 2025 WL 3188406 (S.D. Ga. Nov. 14, 2025). But many of those cases err in assessing the amount of overlap between the statutes. The statutes are not wholly redundant. For example, the facts of *Jennings*, which involved a lawful permanent resident, illustrate circumstances where § 1225(b)(2)(A) and § 1226 differ in their application: Section 1226 can apply to aliens who *have been admitted* to the United States and are therefore no longer "applicants for admission." *See Jennings*, 583 U.S. at 288. Two other examples of aliens to whom § 1226 applies, but § 1225(b)(2)(B) does not, are erroneously admitted aliens, *see Montoya*, 2025 WL 3733302, at *11, and lawfully admitted aliens "who then remain present unlawfully." *Chen*, 2025 WL 3484855, at *7 (citation omitted); *see also Coronado v. Sec'y, Dep't of Homeland Sec.*, No. 1:25-CV-831, 2025 WL 3628229, at *10 (S.D. Ohio Dec. 15, 2025).

---

[11] "Aliens subject to expedited removal do not receive *any* hearing, while unadmitted aliens subject to § 1225(b)(2)(A) receive a removal hearing under § 1229a, though not a bond hearing." *Montoya*, 2025 WL 3733302, at *6.

It is true that some overlap was created when Congress passed the Laken Riley Act ("LRA"), Pub. L. No. 119-1, 139 Stat. 3 (2025), last year. The LRA added subparagraph (E) to § 1226(c)(1), which requires the Attorney General to detain without bond aliens who (1) are present in the United States without being admitted or paroled, and (2) commit certain crimes. So, aliens present in the United States who have not been admitted are subject to detention under § 1225(b)(2)(A), and if they commit certain crimes, could also be subject to detention under § 1226(c)(1)(E). But this limited redundancy is not enough to persuade the Court that Petitioner's interpretation of the statutes is correct for several reasons.

First, as other courts have noted, prior presidential administrations have consistently provided bond hearings for aliens, like Petitioner, who were present in the United States and had not been admitted, despite the language in § 1225(b)(2)(A) requiring mandatory detention. *See, e.g.*, *Cabanas v. Bondi*, No. 4:25-CV-04830, 2025 WL 3171331, at *6 (S.D. Tex. Nov. 13, 2025); *Garibay-Robledo*, 2026 WL 81679, at *8; *Chen*, 2025 WL 3484855, at *6; *Coronado*, 2025 WL 3628229, at *11. Because the LRA eliminated the possibility of these unadmitted aliens being released on bond if they were arrested for, convicted of, or admitted committing certain crimes, it limited the effect of the Executive's decision to treat these aliens as eligible for bond under § 1226(a) (instead of mandatory detention under §1225(b)(2)(A)). *See Cabanas*, 2025 WL 3171331, at *6; *Garibay-Robledo*, 2026 WL 81679, at *8; *Chen*, 2025 WL 3484855, at *6.

Second, the LRA's addition of § 1226(c)(3) suggests not just an intention to guarantee detention, but a desire that detention be achieved in a timely manner. 8 U.S.C. § 1226(c)(3) ("[I]f the alien is not otherwise detained . . . [the Secretary of Homeland Security] shall effectively and *expeditiously* take custody of the alien." (emphasis added)); *see also Singh*, 2026 WL 74558, at *5–6 ("The point of the Laken Riley Act is not to mandate the detention of aliens who otherwise

would *not* be subject to mandatory detention, but instead to mandate the *timing* of the detention of certain aliens."); *Garibay-Robledo*, 2026 WL 81679, at *8 ("It is entirely reasonable, then, to interpret the LRA as providing a temporal gloss on the Executive's detention authority."). On a temporal reading, then, there is potentially *no* redundancy.

Third, and most importantly, without more, the limited redundancy does not provide "a license to rewrite or eviscerate another portion of the statute contrary to its text." *Barton v. Barr*, 590 U.S. 222, 239 (2020); *see Garibay-Robledo*, 2026 WL 81679, at *8; *Montoya*, 2025 WL 3733302, at *12. "[R]edundancies are common in statutory drafting," so "[s]ometimes the better overall reading of the statute contains some redundancy." *Barton*, 590 U.S. at 239 (citation omitted). And the Court is convinced that is the case here.

On the whole, the INA, IIRIRA, and the LRA collectively *strengthen* the Executive's immigration enforcement authority—requiring a bond hearing or ordering Petitioner's immediate release would eviscerate that authority with a reading of §§ 1225 and 1226 that fights the plain text, defies common sense, and ignores congressional intent. For those reasons, "[t]his Court declines to participate in that alchemy." *Chen*, 2025 WL 3484855, at *6.

3.    <u>Estoppel Against the Government</u>

Though not directly addressed in the briefing, during the January 22 hearing, the issue of estoppel was raised. The Parties agreed that the Government obviously retains an ability to change its litigating position, even in the same case, particularly during a transition between presidential administrations. There was, however, some question about whether that flexibility empowers the Government to detain (and then release) an alien present unlawfully under one statutory provision (§ 1226), but then, at its own discretion, re-detain the same alien pursuant to a different statutory

provision (§ 1225) such that he is no longer eligible for release.  Having examined the issue, the Court concludes that the Government *may* do so.

The general (and seemingly universal) rule is that "equitable estoppel will not lie against the Government as it lies against private litigants."  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419 (1990).  Indeed, even when the Government has misled or misinformed a party about the law to that party's detriment, the Supreme Court has declined to credit estoppel theories.  *See, e.g., Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–09 (1917) ("Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.").  The Supreme Court has succinctly summarized this practice: "we have reversed every finding of estoppel that we have reviewed." *Richmond*, 496 U.S. at 422; *see also id.* at 423 (indicating that the arguments for a blanket rule against estoppel of the Government "are substantial"); *Gutierrez v. Gonzales*, 458 F.3d 688, 691 (7th Cir. 2006) ("The Supreme Court has *never* affirmed a finding of estoppel against the government.").

Some courts have nevertheless concluded that the Government has effectively forfeited its opportunity to detain an alien pursuant to § 1225 after initially proceeding under § 1226.  *See, e.g.*, *J.G.O. v. Francis*, No. 25-CV-7233 (AS), 2025 WL 3040142, at *2 (S.D.N.Y. Oct. 28, 2025) ("It has detained noncitizens pursuant to § 1226(a), then, only afterward, argued that they were instead detained under § 1225(b)(2) and ineligible for bond."); *Lopez Benitez*, 795 F. Supp. 3d at 485–86 (determining that the petitioner could not have been reclassified to fall under § 1225 when the Government had consistently invoked § 1226).  But even if the Court were inclined to take a favorable view of estoppel claims against the Government, this case would be a poor vehicle for

20

creating such an exception.  There is nothing in the record to suggest that Petitioner was promised anything or that the Government committed to continue treating him as an alien within the provisions of § 1226.

Moreover, whatever other courts have held, estoppel does not allow "an agency [to] effectively rewrite a statute by enforcing it contrary to its plain language for a long time."  *Singh*, 2026 WL 73558, at *6.  This is particularly true in "the immigration context, where . . . the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'"  *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–491 (1999)). Judge Vyskocil aptly sums it up:

> A failure by the Executive Branch to enforce a statutory provision, or its conclusion that the law does not apply, does not nullify a duly-enacted law. *See* U.S. Const., art. I, § 7; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). There is simply no authority for the proposition that if one presidential administration fails to enforce a statute, the next administration cannot enforce it, even though the statute clearly applies, according to its plain terms, and no promises not to enforce it have been made.

*Chen*, 2025 WL 3484855, at *7.

## B.    <u>Second Question: Does Continued Detention Violate the Due Process Clause?</u>

Petitioner also contends that his detention without a bond hearing violates protections afforded by the Fifth Amendment's Due Process Clause.  (ECF No. 1 at PageID 7.)  The Constitution guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  There is no question—and the parties do not dispute— that "the Fifth Amendment entitles aliens to due process of law in deportation proceedings."  *Reno v. Flores*, 507 U.S. 292, 306 (1993).  Nevertheless, it is also true that, "[i]n the exercise of its broad power over . . . immigration, Congress regularly makes rules that would be unacceptable if applied

to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976). Indeed, the Supreme Court has recently commented that "the through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Dep't of State v. Muñoz*, 602 U.S. 899, 911–12 (2024). "Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Mezei*, 345 U.S. at 210.

To that end, the Government treats aliens in Petitioner's circumstances according to the so-called "entry fiction" theory of immigration law. Aliens who have not "entered the United States within the meaning of the law," i.e., who were never lawfully admitted and do not have leave to remain, are "still in theory of law at the boundary line." *Kaplan v. Tod*, 267 U.S. 228, 231, 230 (1925). Accordingly, Petitioner, who was not lawfully admitted to the United States, is properly considered "on the threshold" of the border, regardless of his literal physical location. *Thuraissigiam*, 591 U.S. at 140 (quoting *Mezei*, 345 U.S. at 212). And consistent with the statutory definition of "applicant for admission" discussed above, "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon v. Plascentia*, 459 U.S. 21, 32 (1982).

In the absence of any constitutionally defined "amount" or "form" of process, the question is whether any process has been afforded by legislative grace, that is, by Congress. *See Thuraissigiam*, 591 U.S. at 140 (explaining that an alien detained after illegal entry "has only those rights regarding admission that Congress has provided by statute"); *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process . . . ."). In the present case, removal proceedings have been initiated by a Notice to Appear, and Petitioner has been detained pursuant to § 1225. (ECF No. 2-1 at PageID 22; ECF

No. 1 at PageID 2.)  And "detention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process."  *Demore v. Kim*, 538 U.S. 510, 523 (2003).

Though Petitioner is not, therefore, entitled to the bond hearing permitted by § 1226, he *is* entitled to the full panoply of statutory rights and procedures authorized by 8 U.S.C. § 1229a, because that is what has been afforded by Congress.  *See* 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission . . . the alien shall be detained *for a proceeding under section 1229a* of this title." (emphasis added)).  Because there is nothing in the record to suggest that this process is not being afforded, Petitioner's due process claim necessarily fails.

**C.**    **Third Question: Is the Court Bound by the Decisions in *Maldonado Bautista*?**

Next, Petitioner contends that, notwithstanding any analyses to the contrary, the Court is bound by orders out of the Central District of California in *Maldonado Bautista v. Santacruz*.  (ECF No. 1 at PageID 7.)  In that case, Judge Sykes granted class certification and declaratory relief to a "Bond Eligible Class" of individuals situated similarly to Petitioner, *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3288403, at *9 (C.D. Cal. Nov. 25, 2025) ("Class Cert. Order"), and then entered a partial final judgment, *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3713982, at *6–7 (C.D. Cal. Dec. 18, 2025) ("Partial Judgment").  The declaratory relief purportedly extended to all class members was "an individualized bond hearing or release [] from detention."  *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3713987, at *2 (C.D. Cal. Dec. 18, 2025) ("Consolidated Order").  Judge Sykes also indicated her intention to grant "classwide vacatur of the unlawful DHS policy."  *Maldonado Bautista* (Partial Judgment), 2025 WL 3713982, at *4.

Without getting too far into the substance of the *Maldonado Bautista* orders, the Court has serious reservations about the reasoning contained therein.  But it is abundantly clear that the

universal nature of the relief ordered is unacceptable for at least two reasons, both aptly laid out

by Judge Hendrix in the Northern District of Texas:

> There are two possible implications to draw from the Central District's claim to authority and from its class-wide declaratory and vacatur relief. Neither is consistent with Supreme Court precedent. Because this Court must follow Supreme Court precedent, it cannot grant the relief requested by the petitioner and bind itself to the Central District's orders.
>
> The first implication from the Central District's order is that, as in any class action, the petitioner's claim here should be denied so that he can bring his claim in the same litigation as his fellow class members. *See, e.g., Ramirez Melgar*, 2025 WL 3496721, at *15 (denying habeas relief in part because, assuming the Central District's orders are binding, relief is appropriate in the Central District only) . . . . But this approach, though graced with the virtue of a single vehicle for litigation, runs counter to the traditional posture of a habeas claim. When challenging detention, a petitioner by "default" must sue "the warden of the facility where [he] is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2024). Indeed, "[t]he plain language of the habeas statute . . . confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." *Id.* at 443.
>
> There are ninety-four United States District Courts. Ninety-three of them are not the Central District of California. It is impossible to reconcile the Supreme Court's requirement of suit within the district of detention with a system whereby individual class members from the other ninety-three districts must file in the Central District to secure individual habeas relief. *See id.* Even then, the wardens who detain these men and women are not currently defendants in the *Maldonado Bautista* class action. This approach is thus inconsistent with binding Supreme Court precedent.
>
> The second implication fares no better . . . [and] runs as follows: the petitioners, consistent with the immediate-custodian rule, will continue to sue in the district of their confinement, but the nationwide class requires that the local federal district judge accept the Central District's declarations of law as binding. Then, having done so, the local district judge must order the class member relief in the form of an individualized bond hearing. In other words, the petitioner asserts that this Court submit to a type of "Simon Says" arrangement with the Central District.
>
> That proposition is even less acceptable than the last. It would require courts to neuter the Supreme Court's holding in *Aleman Gonzalez* that the INA prohibits class-wide injunctive relief. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554–55 (2022). Petitioners would use the Bond Eligible Class as a vehicle to order district courts to grant as individual relief that which is barred by the INA and Supreme Court precedent. The INA would only narrowly stop technical intrusions into

federal immigration policy and flood district courts with the binding orders of
whichever judge certifies a class and first asserts authority over petitioners in the
other ninety-three districts.

*Calderon Lopez v. Lyons*, No. 1:25-CV-226-H, 2025 WL 3683918, at *12–13 (N.D. Tex. Dec. 19,

2025).  Accordingly, the only acceptable conclusion is that the *Maldonado Bautista* relief, to the

extent it purported to be universal, was *ultra vires*.  Thus this Court is not precluded from arriving

at contrary conclusions of law and is not required to grant the relief that the *Maldonado Bautista*

court believed appropriate.

**D.    Fourth Question: Is the Petitioner Entitled to Relief under the APA?**

Finally, the Petition makes only the barest mention of the APA.  (ECF No. 1 at PageID 7.)

None of the briefing addresses a claim under the APA, nor was it discussed at the January 22

hearing.  Nevertheless, the Court will address any potential relief Petitioner might be entitled to

under the APA.

Agency action is "subject to judicial review" when "there is no other adequate remedy in

a court."  5 U.S.C. § 704; *see also Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 427

(6th Cir. 2016) (citing *Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006)) ("[T]o state a claim

for relief under the APA, a plaintiff must allege that his or her injury stems from a final agency

action *for which there is no other adequate remedy in court*.").  But when a petitioner challenges

the validity of his confinement and seeks immediate release, his claim falls "within the core of the

writ of habeas corpus and thus must be brought in habeas."  *Trump v. J. G. G.*, 604 U.S. 670, 672

(2025).  In such a case, habeas is more than an adequate remedy.  Because Petitioner here

challenges the basis for his confinement and seeks immediate release, habeas is the proper remedy

and any APA claim necessarily fails.

25

## <u>CONCLUSION</u>

As the Court heard at the January 22 hearing, Petitioner's situation is a difficult one. The weight of these proceedings and the Government's position regarding his detention have taken a toll on him and his family. And there is nothing in the record to suggest that Petitioner is anything other than a hardworking, otherwise law-abiding individual. But whether the Court likes it or not, Petitioner's circumstances do not determine the outcome of his claims; § 1225 does, and it mandates detention. "Inquiry beyond that, as to whether such position is the best or wisest use of executive enforcement priorities, or whether it is in line with the priorities of prior Administrations, simply is not the remit of an Article III court. It is instead the subject of legislation and the result of elections, both of which have consequences." *Cabanas*, 2025 WL 3171331, at *6. And though district court judges leave politics behind, "[t]here is hardly a political question in the United States which does not sooner or later turn into a judicial one." Alexis de Tocqueville, Democracy in America 99 (J.P. Mayer ed., George Lawrence trans., 1969). But the Court cannot let the political environment out of which this matter arises obscure the reality of its responsibility.

"The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result." *Texas v. Johnson*, 491 U.S. 397, 420–21 (1989) (Kennedy, J., concurring). Similarly, Justice Scalia once said, "[i]f you're going to be a good and faithful judge, you have to resign yourself to the fact that you're not always going to like the conclusions you reach. If you like them all the time, you're probably doing something wrong." Justice Antonin Scalia, Annual Madison Lecture at Chapman University Fowler School of Law (2005).

The Court's earnest consideration of the issues here compels this result.

26

For the reasons set forth above, the Petition for a Writ of Habeas Corpus under 28 U.S.C.

§ 2241 (ECF No. 1) and Emergency Motion for Temporary Restraining Order and Preliminary

Injunction (ECF No. 2) are **DENIED**.  A judgment will be entered accordingly.


      **IT IS SO ORDERED**, this 13th day of February, 2026.

            *s/ Mark S. Norris*
            MARK S. NORRIS
            UNITED STATES DISTRICT JUDGE